FILED

2021 Sep-08  AM 09:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| ERICA LATREICE RENEE RUTLEDGE, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Case No.   4:20-cv-00708-HNJ |
| ) | |
| SOCIAL SECURITYADMINISTRATION, ) | |
| COMMISSIONER, ) | |
| ) | |
| Defendant ) | |

## MEMORANDUM OPINION

Plaintiff Erica Rutledge seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability, disability insurance, and supplemental security income benefits.   The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.   The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 10).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's

2

impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20

3

C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates

against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Rutledge, age 40 at the time of the ALJ hearing, protectively filed applications for a period of disability, disability insurance, and supplemental security income benefits on September 12, 2016, alleging disability as of August 15, 2016.  (Tr. 179, 296-305).  The Commissioner denied Rutledge's claims, and Rutledge timely filed a request for hearing on February 2, 2017.  (Tr. 199-238, 241-42).  The Administrative Law Judge ("ALJ") held a hearing on October 30, 2018 (Tr. 179-97), and issued an opinion on March 29, 2019, denying Rutledge's claim.  (Tr. 21-38).

Applying the five-step sequential process, the ALJ found at step one that Rutledge did not engage in substantial gainful activity after August 15, 2016, her alleged onset date.  (Tr. 26).  At step two, the ALJ found Rutledge exhibited the severe impairments of status-post January 2015 cerebral infarction, seizure disorder, recurrent right shoulder dislocation, obesity, and depression.  (*Id.*).  At step three, the ALJ found that Rutledge's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 28).

Next, the ALJ found that Rutledge exhibited the residual functional capacity ("RFC")

to perform a range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), with the following exceptions: [she] is limited to no more than four hours of standing or walking in combination during an eight-hour period. As part of the job requirements, [she] would not climb ladders, ropes, or scaffolds; would not reach overhead with the right (non-dominant) upper extremity; and would not perform commercial driving or around hazards. [She] can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. [She] is limited to simple, one to two-step tasks.

(Tr. 31).

At step four, the ALJ determined Rutledge could not perform her past relevant work as a fast food worker. (Tr. 36). At step five, the ALJ determined Rutledge could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC. (*Id.*). Accordingly, the ALJ determined that Rutledge has not suffered a disability, as defined by the Social Security Act, since August 15, 2016. (Tr. 37).

Rutledge timely requested review of the ALJ's decision. (Tr. 292-95). On April 14, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-4). On May 20, 2020, Rutledge filed her complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Rutledge argues the ALJ improperly considered the opinions of the treating and consultative physicians and improperly allowed skepticism to influence his decision. She also asserts the Appeals Council applied an incorrect legal standard,

failed to adequately explain the basis of its decision, and failed to find her disabled after reviewing the new evidence she submitted.

## I.     The ALJ Properly Considered the Treating and Consulting Physicians' Opinions

Rutledge argues the ALJ improperly considered the opinions of Leslie Hollingsworth, her mental health counselor, Dr. Randolph (first name unknown), her treating mental health physician, and Dr. Jimmy Oguntuyo, the consultative examiner. As discussed below, those contentions do not withstand analysis.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Id.* at 1241.   An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.*   An ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings.  *Moore*, 405 F.3d at 1212.

To determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional.   20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff, and opinions supported by medical signs and findings and consistent with the overall "record as a whole").   The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.   *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240).   However, the ALJ must "state with at least some measure of clarity the grounds for [a] decision."   *Winschel*, 631 F.3d at 1179.   This measure of clarity requires the ALJ to state the weight given to each medical opinion and the reason therefor.   *Id.*

## A. The ALJ Properly Considered the Opinions of Rutledge's Treating Mental Health Physician and Counselor

The record contains two Mental Health Source Statement forms.   On October 3, 2018, an individual named Leslie Hollingsworth completed one such form.   She signed the name "Leslie Hollingsworth" on a blank line with the printed title "Dr. Hollingsworth."   (Tr. 827).   However, the record reflects that Hollingsworth is a social worker and counselor, not a medical doctor.

8

Hollingsworth indicated Rutledge could not understand, remember, or carry out very short and simple instructions; maintain attention, concentration and/or pace for periods of at least two hours; perform activities within a schedule and be punctual within customary tolerances; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors and co-workers; maintain socially appropriate behavior; or adhere to basic standards of neatness and cleanliness.   In addition to normal workday breaks, Rutledge would remain off-task 95% of an eight-hour workday.   She would miss work 30 out of 30 days due to psychological symptoms.   Rutledge's medications would cause drowsiness, fatigue, and increased sleep.   Hollingsworth could not state whether Rutledge's limitations existed back to August 15, 2016, the alleged onset date, because she began treating Rutledge in 2017.   (Tr 827).

On October 4, 2018, Dr. Randolph (first name unknown) completed an identical form and provided the same answers Hollingsworth provided.   (Tr. 828).

The ALJ afforded the two Mental Health Source Statement forms "comparatively lesser weight regarding any assessment of the claimant's mental functioning."   (Tr. 35).   He reasoned that Hollingsworth

> is not a medical doctor, is not an acceptable medical source, and has relatively few records of treatment of the claimant in Exhibit 8F, and in those records she basically endorses the claimant's statements. However[,] these treatment records do not include any medical restriction, or even a statement that corresponds to the factors stated about the

claimant's mental functioning, except as alleged by the claimant.   In particular, none of the objective medical evidence shows a treatment frequency or a severity of function, even as alleged by the claimant, which corresponds to the excessive limitations in Exhibit 9F [Hollingsworth's form].   Similarly, Exhibit 10F stated as signed by "Dr. Randolph" does not correspond to any treatment record.   Exhibit [8]F on pages 127 and 148 include a statement (signed by Ms. Hollingsworth) that the patient was to see Dr. Randolph on July 19, 2018.   There are no psychiatric treatment notes for that date, and no treatment note for any date was found to be signed by "Dr. Randolph."   As with Exhibit 9F, there is no corresponding treatment note or medical restriction from any medical source.   Both Exhibit 9F and Exhibit 10F are completed in approximately the same fashion, and in a handwriting and ink characteristic that does not conform to that of the signature on Exhibit 10F.   Attorney Allenstein stated at the hearing that he believed a member of his staff completed the forms . . . .

(*Id.*).

During the administrative hearing, the ALJ asked Rutledge's attorney if he prepared the Mental Health Source Statement forms, and he responded, "Probably someone in our office did, Judge."  (Tr. 183).   Rutledge also confirmed that Leslie Hollingsworth is her mental health therapist, not a medical doctor.   She testified that Dr. Randolph was her mental health doctor.   (*Id.*).   She last received treatment from Dr. Randolph for medication adjustment two and one-half weeks prior to the hearing, and she planned to see him three months thereafter.   She sees Ms. Hollingsworth more often than she sees Dr. Randolph.  (Tr. 184).

The court agrees with Rutledge that the ALJ misconstrued her attorney's statements regarding the origin of the Mental Health Source Statement forms.   To the

extent the ALJ suggests Rutledge's attorney fabricated the forms and/or Dr. Randolph's signature, the evidence does not support that suggestion.   Rutledge's attorney stated someone in his office likely prepared the forms, but that would comport with the typical practice in Social Security disability cases of an attorney's office generating forms for a medical provider to complete.   In addition, while the signature on Dr. Randolph's form does differ in style from the other handwriting on the form, the other handwriting on Dr. Randolph's form appears identical to the handwriting on Hollingsworth's form.   Thus, it appears that Rutledge's attorney generated the forms, Hollingsworth made the handwritten notations on both forms and signed one form, and Dr. Randolph signed the other forms.   That would comport with the typical practice in many doctors' offices of a doctor signing paperwork after another member of the staff has completed the paperwork.   Thus, there exists no substantial evidentiary foundation to question the authenticity of either form.

Even so, the ALJ's erroneous characterization of the origin of the forms constitutes only harmless error because the ALJ otherwise properly considered both forms.

As discussed, the record reflects that Hollingsworth is a social worker and counselor, not a medical doctor.   Therefore, for this claim filed before the March 2017 revision to the Social Security regulations, she does not constitute an acceptable medical

11

source pursuant to Social Security law.   Another district court recently summarized the

distinction between "acceptable" medical sources and "other sources:

> For claims filed before March 27, 2017, the Regulations governing evaluation of opinion evidence draw a distinction between "acceptable" medical sources and "other" sources. 20 C.F.R. § 404.1527(a)(1); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).   Acceptable medical sources include licensed physicians and licensed or certified psychologists, whereas "other" sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. SSR 06-03p. Only "acceptable" medical sources may establish the existence of a medically determinable impairment. SSR 06-03p. And only "acceptable medical sources" can give medical opinions that may be entitled to significant or controlling weight. *Anteau v. Comm'r of Soc. Sec.*, 708 F. App'x 611, 613 (11th Cir. 2017).   But "other" sources . . . may show the severity of an individual's impairment and how it affects the individual's ability to function. SSR 06-03p.

*Robinson v. Commissioner of Social Security,* No. 6:20-CV-1031-DNF, 2021 WL 3701558, at

*5 (M.D. Fla. Aug. 20, 2021) (footnote omitted).   Thus,

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given the opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-3p, 2006 WL 2329939, at *6.[2]

---

[2]  The agency rescinded SSR 06-03p effective March 27, 2017.   However, because the claimant filed for disability in 2016, the ruling in effect at that time governs the analysis. SSR 96-2P, 2017 WL 3928298, at *2 ("The final rules revised these policies for claims filed on or after March 27, 2017, in several ways. For example, in claims filed on or after March 27, 2017, the final rules state that all medical sources, not just acceptable medical sources, can make evidence that we categorize and

The ALJ followed those requirements when considering Hollingsworth's assessment. Even though the regulations do not require the ALJ to afford Hollingsworth's assessment any particular weight, he articulated that he afforded it lesser weight, and he explained that he did so because Hollingsworth did not have a long history of treating Rutledge, she primarily endorsed Rutledge's statements, and neither Hollingsworth's records nor any of the other evidence supported the level of restrictions Hollingsworth imposed. Those factors all constituted permissible considerations. *See* SSR 06-3p, 2006 WL 2329939, at *4-5 (the weight accorded evidence from other sources will vary according to the particular facts of the case; the source of the opinion, including that source's qualifications; the opinion subject matter; the length of the relationship; and other factors).

Moreover, substantial evidence supported the ALJ's decision. Rutledge commenced mental health treatment at Quality of Life Health Services on December 28, 2017. Even though Quality of Life characterized the visit as a Psychiatric Diagnostic Evaluation, Rutledge saw Hollingsworth, a social worker and counselor, not a psychiatrist. (Tr. 712). During that visit, Rutledge reported symptoms of depression and anxiety. She sometimes experienced incoherent speech and trouble thinking,

---

consider as medical opinions.").

13

concentrating, making decisions, and remembering.   She reported that her symptoms impaired her daily activities, ability to work, social activities, and relationships.

The mental status examination revealed normal appearance, stature, posture, eye contact, and activity; anxious attitude toward the examiner; depressed mood; full affect; clear speech; forgetful thought processes; normal perception and thought content; no hallucinations; average intelligence; and normal insight and judgment.   She denied suicidal or homicidal ideation.   Hollingsworth assessed a GAF score of 45, indicating serious symptoms.   She educated Rutledge on cognitive behavioral techniques and relaxation exercises, provided her with a wellness checklist, and encouraged her to increase her activity level when her pain was manageable.   She also referred Rutledge to Dr. Randolph for a psychiatric assessment.   (Tr. 712-16).

As the ALJ stated, the record does not contain any treatment records from Dr. Randolph.   Rather, Rutledge received psychological counseling from Cathy Keel, another social worker, on January 4, 2018.   Keel stated that Dr. Randolph "wants therapist to gauge clinical response to medication and set follow up psychiatric appointment based on this assessment."   (Tr. 717-18).

Rutledge again received counseling from Hollingsworth on February 7, 2018. She reported her medications made her feel dizzy and drowsy, but they helped with mood swings, outbursts, irritability, frustration, and restlessness.   However, she continued to feel worthlessness and guilt about not being able to work, suffer

nightmares from past trauma, and experience trouble with speech, thinking, concentrating, remembering, and making decisions.   Hollingsworth assessed moderate major depressive disorder, and she again assigned a GAF score of 45.   (Tr. 726-30).

Hollingsworth counseled Rutledge again on April 5, 2018.   Rutledge reported minimal progress, as she continued to feel sad and tearful, had no desire to leave her home, slept most of the day, and experienced mood swings.   During the clinical examination, Rutledge exhibited sad, tearful affect, but no significant changes in her thought processes, orientation, motor activity, speech, behavior, or functioning.   She continued to deny suicidal or homicidal ideation.   Hollingsworth assessed moderate major depressive disorder and moderate post-traumatic stress disorder, and she again assigned a GAF score of 45.   (Tr. 739-42).

Hollingsworth counseled Rutledge again on May 31, 2018.   Rutledge reported minimal progress, but she continued to report symptoms of depression and anxiety. The clinical examination revealed depressed mood, full affect, logical thought processes, normal motor activity and speech, and tearful behavior, but no suicidal or homicidal ideation.   Hollingsworth again assessed moderate major depressive disorder and assigned a GAF score of 46.   (Tr. 752-55).

Rutledge next received counseling from Hollingsworth on July 11, 2018.   She reported minimal progress, and the mental examination produced no significant changes in mood, affect, thought processes, orientation, motor activity, speech,

behavior, or functioning.   She denied suicidal or homicidal ideation.   Hollingsworth again assessed moderate major depressive disorder and assigned a GAF score of 46. (Tr. 774).

Thus, the record reflects Hollingsworth treated Rutledge on five occasions during an approximate seven-month period prior to the ALJ's decision, consistent with the ALJ's observation that Rutledge saw Hollingsworth on relatively few occasions.   In addition, although Hollingsworth's Quality of Life records reflect she experienced depression and anxiety, they do not document the disabling level of mental impairments Hollingsworth assessed.   Indeed, despite Hollingsworth's assignment of a GAF score indicating serious symptoms, she assessed Rutledge with only moderate major depressive disorder, and appeared to base her assessments primarily upon Rutledge's subjective complaints, as the ALJ observed.   In comparison, the clinical assessments revealed relatively normal findings other than some tearfulness, anxiety, and forgetfulness.   Moreover, when Rutledge presented to Quality of Life for treatment of her physical conditions, the clinical examinations also produced normal mental health findings. (Tr. 724, 736, 748, 759, 767, 780, 788).   The ALJ acknowledged Rutledge experienced some mental health problems, and he incorporated those conditions into his residual functional capacity finding by limiting Rutledge to simple, one- to two-step tasks.   (Tr. 31).

16

Thus, the record does not support a finding that the ALJ erred in evaluating Hollingsworth's assessment.

For similar reasons, the ALJ did not err by affording less weight to Dr. Randolph's assessment. The Commissioner argues Dr. Randolph did not serve as Rutledge's treating physician, and his assessment consequently did not deserve the deference normally afforded to treating physician opinions. The record does not provide a definitive resolution to that argument. On one hand, the record does not contain an actual treatment record from Dr. Randolph. On the other hand, some of Rutledge's mental health counseling records include references to Dr. Randolph's treatment plan, indicating that Dr. Randolph did in fact treat Rutledge, and Rutledge testified Dr. Randolph was her mental health doctor.

However, the court can persist despite that discrepancy: even if Dr. Randolph constituted a treating physician, the ALJ still demonstrated good cause for affording less weight to Dr. Randolph's assessment. As discussed, the ALJ found Dr. Randolph's assessment inconsistent with Rutledge's treatment records from Quality of Life and the other record evidence. Those reasons constituted a permissible consideration, and as discussed regarding Hollingsworth's assessment, substantial evidence supported the ALJ's conclusion.

In summary, the ALJ properly considered the Mental Health Source Statement forms from both Hollingsworth and Dr. Randolph.

### B.     The ALJ Properly Considered the Consultative Examiner's Opinion

On December 5, 2016, Dr. Jimmy Oguntuyo conducted a consultative examination on behalf of the Commissioner.   Rutledge reported suffering a stroke on December 31, 2015, and she continued to experience right side weakness of the upper extremity, right shoulder pain, and numbness and tingling of the right upper extremity and right hand.   She also reported a seizure disorder, and she injured her right shoulder during a recent seizure episode.   She ranked her shoulder pain at a level eight out of ten, but the pain waxed and waned with use, rest, and anti-inflammatory medications. She reported lumbosacral pain at a level six to eight out of ten, which increased with activities such as bending, prolonged sitting, standing, walking, and lifting.

During the clinical neurological examination, Rutledge exhibited full alertness and orientation, decreased sensation in the right upper extremity, intact proprioception and vibration senses, wide-based gait, full left hand grip strength, 3-4/5 right hand grip strength, and the abilities to toe walk, heel walk, squat, rise, button, tie shoelaces, pick up small objects, hold a glass, and turn a doorknob.   She displayed decreased range of motion in the right shoulder during abduction, adduction, forward elevation, and internal and external rotation.   The range of motion in her other joints fell within normal limits.   (Tr. 619-25).

Dr. Oguntuyo stated Rutledge

may not be able to perform any meaningful work related activities that may involve prolonged sitting, standing, walking, lifting, carrying, [or] handling objects, because of the CVA [acute infarct of the right frontoparietal lobe with associated vasogenic edema and tiny acute infarct of the left lobe of the cerebellar] with right hemi-paresis/hemiplegia, history of seizure disorders requiring the use of anti-seizure medications [Keppra and Dilantin], dislocation of the right shoulder with associated pain and neuropathy following episode of seizures.

Other comorbidities include:  Hypertension, dizziness, obesity, BMI 33.67 and peripheral neuropathy.   [T]he drowsiness and somnolence from the antiseizure medications could also be incapacitating.

(Tr. 621 (second and third brackets in original)).

The ALJ afforded Dr. Oguntuyo's assessment "some weight," but he did not fully credit Dr. Oguntuyo's opinions to the extent they indicated Rutledge could not perform any work activity.   (Tr. 33).   Rutledge argues the ALJ failed to articulate with the required level of clarity his reasons for not fully crediting Dr. Oguntuyo's assessment, and he thereby substituted his own judgment for the doctor's.   However, the record does not support that argument.

The ALJ stated he afforded Dr. Oguntuyo's assessment only "some weight" because it was "somewhat vague and unspecified, is inconsistent with the relatively normal examination findings noted in the record, as well as the claimant's admitted and indicated activities and abilities, which include shopping, preparing meals, and perform[ing] household chores . . . ."   (Tr. 33).   Thus, the ALJ satisfied the Eleventh

19

Circuit's requirement to articulate the basis for his decision with "some level of clarity." *See Winschel*, 631 F.3d at 1179.[3]

The ALJ also properly considered the "somewhat vague and unspecified nature" of Dr. Oguntuyo's opinion (Tr. 33), as the regulations direct the Commissioner to afford more weight to properly explained medical opinions.   20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").   Dr. Oguntuyo never stated Rutledge could not perform *any* work-related activities involving the physical functions listed.   Rather, he stated Rutledge *may* be unable to perform *prolonged* sitting, standing, walking, lifting, carrying, or handling.   The ALJ's residual functional capacity finding accommodated those limitations by restricting Rutledge to light work with only four hours of standing or walking; no climbing ladders, ropes, or scaffolds; no working around hazards; only occasionally climbing ramps and stairs; only

---

[3] Rutledge urges the court to apply *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995), where the Seventh Circuit regarded "with a degree of suspicion the administrative law judge's decision to go against the only medical evidence in the case, that of a psychiatrist not retained by the applicant but appointed by the administrative law judge himself to advise on Wilder's condition." *Id.* at 337.   But the Eleventh Circuit has rejected *Wilder*. *Jackson v. Soc. Sec. Admin., Comm'r*, 779 F. App'x 681, 685 (11th Cir. 2019) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004)) ("[W]e decline Jackson's invitation to adopt the standard set forth by the Seventh Circuit in *Wilder*.   Contrary to her assertion, we have articulated our own standard for reviewing the opinions of agency-appointed consulting physicians.").   Moreover, as in *Jackson*, in this case, Dr. Oguntuyo's assessment did not provide the only medical evidence regarding Rutledge's physical limitations.   *Jackson*, 779 F. App'x at 685 ("Moreover, *Wilder* is inapposite because the facts of that case differ substantially from the present case. 64 F.3d at 338 (determining that, where the consulting physician's opinion was the only medical evidence regarding the applicant's mental health impairments, the ALJ's rejection of that opinion was based on 'rank conjecture')").

occasionally balancing, stooping, kneeling, crouching, and crawling; no reaching overhead with the right upper extremity; and no commercial driving.

Moreover, the medical evidence provides substantial evidentiary support for the ALJ's decision to afford some weight to Dr. Oguntuyo's opinion, except to the extent the opinion would preclude all work activity.  During Dr. Oguntuyo's examination, Rutledge's only functional deficiencies consisted of decreased sensation in the right upper extremity, reduced right hand grip strength, and decreased range of motion in the right shoulder.  Otherwise, she displayed full alertness and orientation, intact proprioception and vibration, full left grip strength, normal range of motion in all other joints, and the abilities to toe walk, heel walk, squat, rise, button, tie shoelaces, pick up small objects, hold a glass, and turn a doorknob.  To be sure, other medical records indicate Rutledge continued to suffer seizures that resulted in temporary dizziness, headaches, and gait and speech disturbances; yet, she consistently displayed full alertness and orientation, no acute distress, no neurological deficits, normal range of motion except in the right shoulder, normal muscle strength, good coordination, and good memory.  (Tr. 465, 470-71, 473, 479-80, 504, 529, 537, 549, 556, 583, 589, 596, 602, 633, 640, 647, 653, 660, 667, 675, 686, 702, 709, 724, 748, 759, 767, 780, 788, 891).

The ALJ also properly relied upon the assessment of Dr. Maria Wellman, the state agency physician, who reviewed Rutledge's medical records and Dr. Oguntuyo's findings on December 16, 2016.  Dr. Wellman determined Rutledge could occasionally

lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. She could stand and/or walk four hours and sit six hours during an eight-hour day. She experienced limitation of her ability to push and pull with her right upper extremity. Rutledge could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She could perform unlimited handling, fingering, and feeling, but she could perform only limited overhead reaching with the right upper extremity. She experienced no visual or communicative limitations, and her only environmental limitations included the need to avoid exposure to hazards such as machinery, unprotected heights, and large bodies of water. (Tr. 208-11).

The ALJ afforded "significant, but not conclusive weight" to Dr. Wellman's assessment as it represented "the only supported, comprehensive, and detailed assessment of [Rutledge's] physical functioning," and it was "generally consistent with the entirety of the evidence available at that time." (Tr. 33). The ALJ did not afford the assessment conclusive weight as Dr. Wellman "did not have the benefit of additional evidence submitted at the hearing level." (*Id.*). That decision complies with Social Security law, which permits an ALJ to favor a medical opinion he perceives as the most consistent with the record evidence. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Davis*, 449 F. App'x at 832.

22

The law also permits an ALJ to credit the opinion of a state agency physician over the opinion of a consulting or treating physician, if the evidence so warrants.

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).   As stated in *Duncan v. Berryhill*, No. 3:15-cv-02164-LSC, 2017 WL 3969578 (N.D. Ala. Sept. 8, 2017):

> [M]edical consultants or medical experts are highly qualified medical specialists who are experts in the Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions.   *See* 20 C.F.R. §[§ 404.1527(e), 404.1513a, 416.927(e), 416.913a]; SSR 96-6p.   Indeed, a medical expert's opinion may be entitled to greater weight than the opinions of treating or examining sources in appropriate circumstances, such as when the medical expert has reviewed the complete case record.   *See* SSR 96-6p.   In short, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion."   *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

*Id.* at *4.

Here, as discussed, substantial evidence supports the ALJ's conclusion that Rutledge's medical records demonstrated relatively normal examination findings.

Thus, Dr. Wellman's assessment provided additional evidentiary support for the ALJ's decision not to fully credit Dr. Oguntuyo's findings.

In her reply brief, Rutledge also suggests the ALJ should have obtained additional medical information or recontacted Dr. Oguntuyo for additional explanation. According to Social Security regulations, an ALJ should recontact a medical source or obtain additional medical evidence if the evidence in the record "does not contain all the information [the ALJ needs] to make [his] determination or decision." 20 C.F.R. §§ 404.1520b(b), 416.920b(b).   However, an ALJ bears no responsibility to recontact medical sources or obtain additional information when the record already contains substantial evidence to support a decision.   *Robinson v. Astrue*, 365 F. App'x 993, 999 (11ᵗʰ Cir. 2010).   Because the ALJ relied upon substantial evidence contradicting Dr. Oguntuyo's opinion, he maintained no duty to seek clarification from Dr. Oguntuyo, or to obtain additional medical evidence to support his decision.

In summary, the ALJ adequately articulated his reasons for rejecting Dr. Oguntuyo's assessment of Rutledge's physical limitations, and he relied upon permissible considerations, including the vague nature of the assessment, Dr. Oguntuyo's own examination findings, Rutledge's other medical records, and the state agency physician's opinion, which provided substantial evidentiary support for the ALJ's residual functional capacity finding.   The ALJ did not err in evaluating Dr. Oguntuyo's assessment.

## II.     The Record Does Not Support Rutledge's Allegations of Bias by the ALJ

Rutledge argues the ALJ "is extremely skeptical and his skepticism influenced his decision."   (Doc. 11, at 45).   To support that argument, Rutledge asserts that in 2019, the ALJ "approved only 31% of the cases he has decided.   In comparison, the other ALJs in Alabama approved 48%."   (*Id.*).

A presumption exists that judicial and quasi-judicial officers such as ALJs present no bias.   *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982).   A claimant may overcome this presumption by "a showing of a conflict of interest or some other specific reason for disqualification," yet the burden for such a showing rests upon the party asserting such bias.   *Id.* at 195-96.   In multiple unpublished opinions, the Eleventh Circuit has held that an ALJ's low approval rate does not suffice, in and of itself, to demonstrate bias.   As the Eleventh Circuit recently explained,

> an ALJ's number of reversals in district court and the percentage of disability cases the ALJ approves are general assumptions that cannot survive the presumption of non-bias.   Finally, we are not concerned with the ALJ's past low approval rate compared to other ALJs because *in this case* the ALJ satisfied his duties at Contreras-Zambrano's hearing to "develop a full and fair record" and to "carefully weigh the evidence, giving individualized consideration to each claim."

*Contreras-Zambrano v. Soc. Sec. Admin., Comm'r*, 724 F. App'x 700, 703 (11ᵗʰ Cir. 2018) (emphasis in original) (quoting *Miles v. Chater*, 84 F.3d 1397, 1401 (11ᵗʰ Cir. 1996) (per curiam)); *see also Kirby v. Soc. Sec. Admin., Comm'r,* 819 F. App'x 828, 836 (11ᵗʰ Cir. 2020) ("While Claimant contends that the ALJ's rulings have often been challenged and

25

reversed, he has not identified comments by the ALJ in these proceedings or any other evidence suggesting that the ALJ prejudged his case."); *Wells v. Soc. Sec. Admin., Comm'r*, 777 F. App'x 429, 433 (11th Cir. 2019) ("Wells argues that the administrative law judge has a low rate of favorable decisions and has been reversed by the district court, but Wells acknowledges 'that statistics alone are not evidence of bias.'"); *Putman v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 929, 936 (11th Cir. 2017) (citing *Schweiker*, 456 U.S. at 195-96) ("[W]ithout some particularized showing of a reason for disqualification, a generalized assumption of bias derived from the ALJs low approval rate is insufficient to rebut the presumption of impartiality.").

Further, before assigning ALJ bias as grounds for reversal, a claimant should raise the issue of ALJ bias at the "earliest opportunity." 20 C.F.R. §§ 404.940, 416.1440; *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 874-75 (11th Cir. 2011). If an ALJ declines to recuse, the claimant may seek reconsideration before the Appeals Council. *See id.* However, the record does not indicate that Rutledge raised the issue of bias at the ALJ or Appeals Council level.

Rutledge did not satisfy her burden of demonstrating the ALJ's bias. Her statistical arguments regarding the ALJ's past decisions do not suffice, and she has offered no other evidence of bias. She asserts that the ALJ "failed to consider all of [her] severe impairments, failed to give appropriate weight to the Commissioner's medical expert, and failed to give appropriate weight to the treating physicians." (Doc.

11, at 47).   But the court already found the ALJ properly considered the treating and examining medical opinions, and Rutledge does not explain which additional impairments the ALJ should have considered severe.

Even if the ALJ erroneously failed to characterize other impairments as severe, the error was harmless.   The Eleventh Circuit recognizes that an ALJ's failure to name all of a claimant's severe impairments at step two of the sequential process causes no harm if the ALJ considers all impairments when evaluating the claimant's residual functional capacity at step four.   *See Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1268 (11th Cir. 2019) ("Our conclusion that substantial evidence does not support the ALJ's finding that Schink's mental impairments were non-severe does not necessarily end the discussion. That finding could be harmless if the ALJ nevertheless proceeded in the sequential evaluation, duly considered Schink's mental impairment when assessing his RFC, and reached conclusions about Schink's mental capabilities supported by substantial evidence.").   Here, the ALJ stated that his residual functional capacity finding considered "any functional limitations resulting from the claimant's nonsevere impairments or the combination thereof."   (Tr. 27).   Absent any specific argument from Rutledge, the court can identify no impairment the ALJ failed to consider. Accordingly, the ALJ's assessment of Rutledge's severe impairments does not provide a substantive basis for reversal.

As Rutledge has identified no indication of the ALJ's error, or any other evidence of bias in her particular case, her general allegations of bias do not provide a basis for questioning the ALJ's decision. *See Allenstein ex rel. Estate of Small v. Barnhart*, 419 F. Supp. 2d 1336, 1337 (N.D. Ala. 2006) ("Because substantial evidence supports the ALJ's decision, and there is no indication that the record was not properly developed, the decision of the Commissioner must be affirmed.").

### III.  The Appeals Council Applied the Correct Legal Standard, Demonstrated It Adequately Considered Rutledge's New Evidence, and Properly Concluded the New Evidence Did Not Deprive the ALJ's Decision of Substantial Evidentiary Support

Generally, a claimant may present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. §404.900(b)). The Appeals Council will review a case if it receives additional "evidence that is new, material, and relates to the period on or before the date of the [ALJ] hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5).

Here, Rutledge submitted additional medical records to the Appeals Council after the ALJ's decision. The Appeals Council stated it applied the following standard when it considered the new evidence:

> We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision. You

must also show there is a reasonable probability that the additional evidence would change the outcome of the decision.  You must show good cause for why you missed informing us about or submitting it earlier.

(Tr. 2).   The Appeals Council received medical records from Riverview Medical Center dated November 5, 2018; records from Dowling and Caldwell dated November 6, 2018; records from Gadsden Regional dated November 2, 2018, through November 21, 2018; and records from Quality of Life Health Services dated October 26, 2018, through March 20, 2019.   It found that evidence "does not show a reasonable probability that it would change the outcome of the decision," and it consequently did not exhibit the evidence.   (*Id.*).   The Appeals Council also received Quality of Life records dated April 3, 2019, through May 15, 2019.   But as the ALJ decided Ruledge's case through March 29, 2019, that additional evidence did not "relate to the period at issue" and did not "affect the decision about whether [Rutledge was] disabled beginning on or before March 29, 2019." (*Id.*).

Rutledge argues the Appeals Council applied an erroneous legal standard, failed to demonstrate that it adequately considered her new evidence, and improperly found her not disabled despite the new evidence.   As set forth below, those contentions do not withstand review.

## A.   The Appeals Council Applied the Correct Legal Standard

Rutledge argues the Appeals Council erred by considering whether her new evidence presented a reasonable *probability* of changing the outcome of the ALJ's

29

decision, when it should have considered whether the evidence presented a reasonable *possibility* of changing the decision.[4]   That argument lacks merit.   Effective January 17, 2017, the Commissioner revised 20 C.F.R. §§ 404.970(a)(5) & 416.1470(a)(5) to include the above-stated requirement that new evidence must demonstrate a "reasonable probability" of changing the outcome of the ALJ's decision, with compliance required as of May 1, 2017.   *See* 81 FR 90987-01, 2016 WL 7242991 (Dec. 16, 2016).   Thus, the Appeals Council applied the language of the regulation in effect on the date of Rutledge's appeal.

Rutledge argues the revised regulation should not apply because she initially filed her claim for benefits on September 12, 2016, prior to the effective date of the revisions. However, the Federal Rule implementing the revisions states it takes effect on May 1, 2017, and it contains no exception for claims initially filed before the effective date. Other district courts have applied the revised regulation when the claimant requested Appeals Council review after May 1, 2017, as Rutledge did here.   *See, e.g., Benson v. Comm'r of Soc. Sec.,* No. 2:19-CV-00409-SRW, 2021 WL 3686623, at *1, 4 (M.D. Ala. Aug. 19, 2021) (applying the revised regulation when the claimant applied for benefits on June 2, 2015, but requested Appeals Council review in 2018); *O'Connell v. Comm'r of*

---

[4] In addition to the other points referenced herein, Rutledge did not explain how applying the "reasonable possibility" standard would result in a different outcome than the "reasonable probability" standard.

*Soc. Sec.*, No. 6:18-CV-1760-ORL-EJK, 2020 WL 1492824, at *1 (M.D. Fla. Mar. 27, 2020) (applying the revised regulation when the claimant applied for benefits on February 19, 2015); *Hymes v. Comm'r of Soc. Sec.*, No. 8:18-CV-1816-T-MAP, 2019 WL 4565466, at *3 (M.D. Fla. Sept. 20, 2019) (applying the revised version of the regulation effective "[w]hen Plaintiff requested Appeals Council review on November 16, 2017"); *Timmons v. Soc. Sec. Admin., Comm'r*, No. 5:17-CV-00224-AKK, 2018 WL 4510512, at *5 n.7 (N.D. Ala. Sept. 20, 2018) (applying the previous version of the regulation because the Appeals Council denied the claimant's request for review on October 29, 2015, prior to the revision date).[5]

In conclusion, the Appeals Council applied the correct legal standard.

## B.   The Appeals Council Demonstrated It Adequately Considered Rutledge's New Evidence

Rutledge argues the Appeals Council's decision fails to demonstrate it adequately considered the new evidence she submitted.   As discussed below, that argument does not withstand review.

---

[5] The court notes this contrasts with the Commissioner's 2017 revisions to the regulations addressing the consideration of medical evidence, whose applicability depends on the date on which the claimant initially filed his or her claim for benefits.   In the Federal Rule instituting the revisions to the medical evidence regulations, the Commissioner repeatedly states that the revisions apply to *claims filed* on after March 27, 2017.   *See* 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).   The Federal Rule implementing the revisions to 20 C.F.R. §§ 404.970(a)(5) & 416.1470(a)(5) makes no such reference to the claim's filing date.   The distinction makes sense, as the medical evidence regulations apply to the Commissioner's consideration of evidence throughout the claims review process, while §§ 404.970(a)(5) & 416.1470(a)(5) address only the activities of the Appeals Council.

When a claimant properly presents new evidence and the Appeals Council denies review, the Appeals Council need not "give a detailed rationale for why each piece of new evidence submitted to it does not change the ALJ's decision." *Mitchell v. Comm'r, Soc. Sec. Amin.*, 771 F.3d 780, 784 (11th Cir. 2014); *accord Beavers ex rel. J.W. v. Soc. Sec. Admin., Comm'r*, 601 F. App'x 818, 821-22 (11th Cir. 2015) (pursuant to *Mitchell*, the Appeals Council need not discuss new evidence in denying a claimant's request for review of the ALJ's decision); *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 903 (11th Cir. 2011) (In denying review, the Appeals Council did not err in providing "no indication of the weight it gave to the newly submitted evidence or the legal standards it applied," or in failing to "discuss the impact of [the] evidence on [the] claims.").

Here, the Appeals Council explained that Rutledge's new evidence either did not show a reasonable probability of changing the outcome of the ALJ's decision or did not relate to the relevant time period.   It did not need to give a more detailed explanation or address each piece of new evidence individually.   *See White v. Comm'r of Soc. Sec. Admin.*, No. 4:16-cv-00248-JHE, 2017 WL 4246895, at *4 (N.D. Ala. Sept. 25, 2017) (finding the Appeals Council's explanation that "new information is about a later time" sufficiently established that the Appeals Council considered the substance of the new records); *Zanders v. Berryhill*, No. CA 16-0542-MU, 2017 WL 3710790, at *14 (S.D. Ala. Aug. 28, 2017) (the Appeals Council's statement that it reviewed new evidence and concluded it related to "a later time" was sufficiently directed to materiality and/or

32

chronological relevance, and did not amount to an inadequate or perfunctory evaluation of the evidence) (citing *Mitchell*, 771 F.3d at 784-85; *Beavers*, 601 F. App'x at 822). Accordingly, the Appeals Council adequately explained its decision.

### C.  The Appeals Council Properly Found Rutledge Not Disabled Even After Considering the New Evidence

Rutledge argues the Appeals Council erred in denying her appeal because the new evidence she presented to the Appeals Council demonstrated her disability.  The court reviews the Appeals Council's decision by assessing whether Rutledge presented new, material, and chronologically relevant evidence, and whether the new evidence renders the ALJ's decision erroneous by undermining the substantial evidence supporting the ALJ's decision.  *See Mitchell*, 771 F.3d at 785; 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5).

Rutledge failed to identify the new medical records that would support a finding of disability or explain how the new records undermine the ALJ's decision.  The only substantive discussion in her brief addresses a different claimant's evidence and a different claims period.[6]  Moreover, after reviewing Rutledge's new evidence, the court finds no evidence that would reasonably call into question the evidentiary basis for the ALJ's decision.

---

[6] Rutledge states:  "Importantly, all submissions describe physical and psychological symptoms manifested by Howard that, due to their nature and severity, could bear on her condition during the relevant period between 7/1/05 and the alleged onset date 3/11/11 and 1/25/13, the date of the decision."  (Doc. 11, at 53).

33

On November 2, 2018, Rutledge presented to the emergency room with complaints of moderate dizziness and vertigo.   The clinical examination revealed alertness, full orientation, no acute distress, intact cranial nerves, normal sensory and motor function, normal speech, normal coordination, normal strength and range of motion, normal back alignment, normal judgment, appropriate cooperation, and appropriate mood and affect.   A CT scan revealed evidence from a previous stroke but otherwise no acute intracranial abnormality.   (Tr. 58-60).   During a November 21, 2018, emergency room visit for elevated Dilantin levels, Rutledge exhibited normal muscle strength and range of motion, full orientation, normal sensory and motor function, normal speech, and cooperative, appropriate mood and affect.   (Tr. 49).

On November 6, 2018, Rutledge presented to Dowling & Caldwell, M.D., P.C. with complaints of vertigo.   Dr. Richard K. Caldwell recommended inner ear testing, but Rutledge did not attend the test.   (Tr. 65).

On November 5, 2018, Rutledge presented to Riverview Regional Medical Center with complaints of dizziness and fever.   She appeared fully oriented, with normal range of motion and normal mood and affect.   (Tr. 175-77).

Rutledge also continued to receive treatment from Quality of Life.   On October 26, 2018, she reported dizziness and ear problems.   The clinical evaluation revealed normal memory and full orientation.   (Tr. 70-77).   On October 30, 2018, she continued to report dizziness that caused trouble walking.   The examination revealed

34

a spinning sensation and cerebellar ataxia but otherwise normal neurological and psychiatric findings.   (Tr. 78-86).   On November 20, 2018, she reported worsening dizziness and problems walking.   The examination assessed no neurological findings, but it did reveal normal musculoskeletal function, full orientation, and appropriate mood and affect.   (Tr. 87-95).

On November 26, 2018, Rutledge presented for a follow-up after her emergency room visit for elevated Dilantin levels.   The examination revealed normal memory and full orientation.   (Tr. 96-104).   On January 2, 2019, Rutledge presented for a follow-up of her lab results.   The clinical examination revealed normal musculoskeletal, neurological, and psychiatric findings.   (Tr. 110-17).   On January 18, 2019, Rutledge complained of hypertension and seizures occurring approximately once a month.   She did not comply with her anti-seizure medication.   The clinical examination revealed normal musculoskeletal, neurological, and psychiatric findings.   (Tr. 124-32).

On March 6, 2019, Rutledge presented for a gynecological examination.   She demonstrated full orientation and appropriate mood and affect.   (Tr. 139-45).   On May 15, 2019, after the ALJ's decision, Rutledge presented for a follow-up of her lab results and complaints of tooth pain.   She reported experiencing two seizures the day before.   She could not afford all her medications.   The physical examination revealed normal memory, normal cranial nerve function, full orientation, and appropriate mood and affect.   (Tr. 168-73).

On December 13, 2018, Rutledge received psychotherapy from Hollingsworth at Quality of Life.   She reported depression and anxiety, but not as much daily tearfulness, and not as many nightmares.   She continued to experience poor appetite and sleep disturbances.   She experienced long-term memory problems and impaired concentration.   She reported feeling better physically and experiencing less dizziness. She demonstrated euthymic and constricted mood, logical thought processes, normal cognition, normal motor activity and strength, appropriate behavior and functioning, and improved medical condition.   She reported no suicidal or homicidal ideation. Hollingsworth assessed moderate depressive disorder and assigned a GAF score of 45. (Tr. 105-09).

On January 10, 2019, Rutledge again received psychotherapy from Hollingsworth.   She continued to report depression, anxiety, and sleep disturbances. She felt physically ill and worried she had contracted a sickness.   She displayed disheveled appearance, slumped posture, intermittent eye contact, slowed activity, and cooperative attitude.   She exhibited tired mood, flat affect, raspy speech, logical thought processes, normal perception, no hallucinations or delusions, normal cognition, average intelligence, and normal insight and judgment.   She denied homicidal or suicidal ideation.   Rutledge terminated the appointment due to her physical illness, so she could go home and lie down.   (Tr. 118-22).

On January 22, 2019, Rutledge received psychotherapy from Hollingsworth.

36

She reported minimal progress with her depression and anxiety, as she suffered both good and bad days.  She had suffered a light seizure that morning.  She experienced poor memory and concentration, loss of appetite, dizziness, weakness, and sleep disturbances.  Her nightmares had decreased, but she attributed that to her overall lack of sleep.  She worried about doing simple tasks at home.  She denied suicidal or homicidal ideation.  Hollingsworth assessed moderate depressive disorder and assigned a GAF score of 46.  Rutledge appeared overwhelmed by her mental and medical conditions.  (Tr. 133-38).

On March 20, 2019, Rutledge appeared for a psychiatric examination by Dr. Dwayne Narayan, who assessed moderate depressive disorder.  Rutledge reported depression due to her inability to work.  She experienced tearfulness, low appetite, sleep disturbances, and anxiety over her bills.  She tried not to take her depression medications because they made her sleepy.  During the clinical examination, she demonstrated casual dress, pleasant and cooperative behavior, normal psychomotor function, normal speech, normal thought process and content, happy affect, depressed and anxious mood, full orientation, intact attention and language, adequate fund of knowledge, and adequate abstraction, insight, and judgment.  Dr. Narayan found Rutledge's concentration and memory unremarkable according to the clinical conversation.  (Tr. 146-60).

On April 3, 2019, after the ALJ's decision, Rutledge received psychotherapy from

Hollingsworth.   She reported improvement in her depression and anxiety, but she still experienced poor memory, concentration, appetite, and sleep.   She had been complying with her medication.   She demonstrated pleasant mood and affect, logical thought processes, normal motor activity and speech, and normal behavior and functioning.   She denied suicidal or homicidal ideation.   Hollingsworth assessed moderate depressive disorder and assigned a GAF score of 48.   (Tr. 161-67).

The Appeals Council properly found that the April 3, 2019, and May 15, 2019, Quality of Life records did not relate to the relevant time period, as those records dated after the ALJ's decision.   However, even if the Appeals Council had considered those records, the physical examinations reveal findings similar to the past findings, and the psychotherapy records reveal that Rutledge's depression actually improved.

The Appeals Council also properly found that the remainder of the new evidence did not present a reasonable probability of changing the outcome of the ALJ's decision. The new medical records demonstrate Rutledge reported problems with dizziness, but the clinical findings and objective testing produced mostly normal results. Importantly, the records do not demonstrate a worsened physical condition after the ALJ's decision.   Similarly, the psychological records demonstrate Rutledge continued to report symptoms of depression and anxiety, but, other than GAF scores reflecting serious symptoms, the clinical evaluations produced relatively normal findings.   She experienced elevated symptoms on one occasion, but that corresponded to an acute

physical illness.   Overall, the new records do not demonstrate a worsened psychological condition after the ALJ's decision.   Therefore, they do not present a substantial probability of changing the outcome of the decision.

In summary, the Appeals Council applied the correct legal standard, adequately demonstrated it considered Rutledge's new evidence, and correctly determined the new evidence did not provide a basis for overturning the ALJ's decision.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 8th day of September, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE